UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANNETTE DIBENEDETTO,

Plaintiff,

- against -

HARMAN INTERNATIONAL INDUSTRIES, INC.,

Defendant.

**MEMORANDUM OPINION & ORDER**

22 Civ. 2029 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Annette DiBenedetto, a former employee of Harman International Industries, Inc. ("Harman"), brings this age and gender discrimination action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, et seq., the New York State Human Rights Law ("NYSHRL"), New York Executive Law § 290, et seq., and Connecticut General Statute § 46a-60(a)(1).

The Complaint was filed on March 11, 2022. (Cmplt. (Dkt. No. 1)) On January 19, 2024, Defendants moved for summary judgment. (Def. Mot. for Sum. J. (Dkt. No. 64))

For the reasons stated below, Defendant's motion for summary judgment will be granted.

## BACKGROUND

### I. FACTS[1]

#### A. Harman International Industries, Inc.

Harman sells "connected car systems, audio and visual products, enterprise automation solutions and connected services" to "automakers, consumers, and enterprises worldwide." (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 1)

At Harman, jobs are categorized according to a "formal grading system based on the Willis Towers Watson Global Grading System." (Id. ¶ 18) Pursuant to that system, Harman's Global Rewards Team assesses a variety of factors – including the responsibilities a position entails and whether it is managerial in nature – to assign each position a "grade" on a scale from zero to twenty-two. (Id. ¶ 20, 24) Each "grade" is associated with a particular salary structure – meaning all positions assigned the same grade receive the same "salary range."[2] (Id.

---

[1] To the extent that this Court cites facts drawn from movant's Local Rule 56.1 statement, it has done so because Plaintiff has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where Plaintiff disagrees with movant's characterizations of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence. Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

[2] Plaintiff disputes this fact on the ground that Harman has not presented evidence demonstrating the salary range associated with her position. (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 21) Plaintiff relies on a December 7, 2018 email from a Human Resources employee to Plaintiff's future manager, explaining that Plaintiff's salary was "not going to be at [market price]." (Id. ¶ 21 (citing DiBenedetto Decl., Ex. J (Dkt. No. 77-14) at 4-5)) But the fact that Plaintiff's salary was "not going to be at [market price]" does not demonstrate that the salary she received was outside the "salary range" associated with the grading system utilized at Harman. See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) ("To defeat summary judgment, . . . nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts, and they may not rely on conclusory allegations or unsubstantiated speculation.") (internal citations and quotations omitted).

¶ 21) Once a position is graded, the opening is posted by Harman's recruiting team. (Id. ¶ 23) When a position is posted, it is visible to all employees at Harman. (Id. ¶ 126)

An employee can request that their job be "regraded." (Id. ¶ 26) In that scenario, the employee, the manager, and a member of Harman's Human Resources department each contribute to a revised job description. (Id. ¶¶ 27-29) The new description is supplied to the Global Rewards Team, which "puts the job description through an algorithm to come up with the appropriate grade."[3] (Id. ¶ 30)

**B. Plaintiff Joins Harman as a Contractor**

Plaintiff was born on December 30, 1964.[4] (DiBenedetto Decl., Ex. 1 (Dkt. No. 77-1) at 19:8)[5] In September 2017, Paula Davis, Vice President of Communications, hired Plaintiff as a part-time contractor to perform consulting work for Harman. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶¶ 51, 54)

[3] The parties dispute who possesses the ultimate authority to assign job grades. According to Defendant, Harman's Global Rewards Team makes this determination. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 32) Plaintiff counters that the Global Rewards Team is not the ultimate decision-maker because a Human Resources employee sought the "alignment" of Plaintiff's supervisor before regrading Plaintiff's position. (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 32 (citing DiBenedetto Decl., Ex. Q.1 (Dkt. No. 77-21) at 2)) In the same sentence however, the Human Resources employee states that "[w]e'd ultimately need Global Rewards to then regrade [the position]." (DiBenedetto Decl., Ex. Q.1 (Dkt. No. 77-21) at 2) Given these circumstances, Plaintiff has not proffered evidence sufficient to create a genuine issue of material fact on this point. See Jeffreys, 426 F.3d at 554.

[4] In her Amended Response to Defendant's Rule 56.1 Statement, Plaintiff states that she was born on December 30, 1965. (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 6) At her deposition, however, Plaintiff testified that she was born on December 30, 1964. (DiBenedetto Decl., Ex. 1 (Dkt. No. 77-1) at 19:8) The Court relies on Plaintiff's deposition testimony for purposes of her date of birth.

[5] The page numbers of documents referenced in this Opinion – other than as to deposition transcripts – correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system. Citations to depositions are to the page numbers assigned by the court reporter, rather than to the page numbers designated by this District's ECF system.

The parties dispute the nature of Plaintiff's work experience at the time she was hired as a contractor. According to Defendant, Plaintiff's experience was solely in human resources. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶¶ 52-53) Plaintiff counters that her prior "job titles" – including "Senior HR Manager, HR Representative, HR Generalist, Senior HR Coordinator, and Senior HR Analyst" – "were 'not representative of strictly HR work,'" and "her work incorporated numerous aspects beyond basic human resources work." (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶¶ 52-53) In this regard, Plaintiff cites to her deposition testimony stating that she "worked for PepsiCo for many years in human resources, in labor relations, [and] employment law" (DiBenedetto Decl., Ex. 1 (Dkt. No. 77-1) at 12:22-24), as well as her resume. (DiBenedetto Decl., Ex. L (Dkt. No. 77-16)) At the top of her resume, however – just beneath her name – Plaintiff describes herself as a "Human Resources Leader." (Id. at 2) Indeed, every position Plaintiff has held since 1988 is described as a human resources role. (Id. at 2-3)

## C. Davis Interviews Candidates for the Senior Director of Content Role

In 2018, Davis began interviewing candidates to be Harman's Senior Director of Content. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 91) "Harman was looking to hire an individual who had designed a global content strategy on communications." (Id. ¶ 92) Plaintiff did not apply for the Senior Director role (id. ¶ 95), but she assisted with the interview process, including by interviewing Jennifer Jacob. (Id. ¶ 93) Jacob was born on December 18, 1974, and was approximately forty-four years old at the time of her 2018 interview. (Id. ¶ 17, 93) Davis ultimately did not hire a Senior Director of Content and the position remained open. (See id. ¶¶ 57-58, 63))

## D. Plaintiff Joins Harman as a Full-Time Employee

In 2018, Davis left Harman. Following Davis's departure, Darrin Shewchuk became Vice President of Corporate Affairs and Communications. (Id. ¶ 57) Shewchuk was

born on September 24, 1965. (Id. ¶ 10) In 2018, he was approximately fifty-three years old. (Id.) At the time of Shewchuk's promotion, the Corporate Communications team had twelve employees and two open positions (one being the Senior Director of Content). (Id. ¶ 58) "As part of Shewchuk's reorganization of the Corporate Communications team, Shewchuk created the role of Global Corporate Social Responsibility [manager] ('CSR Manager')." (Id. ¶ 60) The new role was deemed a "manager level, not a senior manager or director level" position and assigned "Global Grade 12." (Id. ¶¶ 60-61)

In the fall of 2018, Shewchuk and Plaintiff discussed her transition from part-time contracting work to full-time employment at Harman. (Pltf. Am. R. 56.1 Stmt. (Dkt. No. 82) ¶ 242) On January 14, 2019, Shewchuk hired Plaintiff to be Harman's CSR Manager. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 62) The parties dispute whether – at the time she was hired – Shewchuk promised to eventually promote Plaintiff to a more senior role. According to Plaintiff, she wanted "to be considered for a Director-level role" and Shewchuk "assured [her] that he would revisit her position in about six months." (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶¶ 68, 69) According to Defendant, "DiBenedetto was never promised that the CSR Manager position would be adjusted to a Senior Manager role," let alone a director-level role. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 69)

In support of its assertion that Plaintiff was never promised a senior manager or director-level position, Defendant points to an email from Christine Tschersch, the Director of Corporate Human Resources, to Shewchuk, explaining that Plaintiff "has zero prior [communications] experience" and that Plaintiff "can't call herself Director since [the CSR Manager role is] not a director level role." (Id. ¶ 71 (citing Shewchuk Decl., Ex. C (Dkt. No. 70-

3) at 3)) Defendant also points to an email from Plaintiff to Allison Garrigan in Human Resources stating the following:

> [Paula Davis] left, Darrin [Shewchuk] hired me as CSR Manager. The job had actually been Sr. Manager, CSR and I asked them to adjust; [Shewchuk] said he couldn't at [the time of] hire, but let's get me hired and **he'd address in 6 months with no promises** . . ."

(Def. Reply Br. (Dkt. No. 72) at 15 (citing DiBenedetto Decl., Ex. EE.1 (Dkt. No. 77-40) at 2) (emphasis in Dkt. No. 72))

As CSR Manager, Plaintiff "was responsible for leading Harman's Corporate Citizenship platform and sustainability reporting efforts (including the corporate giving program), managing day-to-day relationships with community and philanthropic partners, and collecting data and managing the sustainability report." (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 74) Plaintiff also worked with other members of the Corporate Communications Department to establish a "sustainability strategy" and create a "sustainability report." (Id. ¶ 75)

Shewchuk intended that the CSR Manager report to the Senior Director of Content. (Id. ¶ 63) As discussed above, however, at the time Plaintiff was hired for the full-time position, the Senior Director position had not been filled. (Id.) In the absence of a Senior Director of Content, Plaintiff reported directly to Shewchuk. (Id.)

### E. Shewchuk Hires a Senior Director of Content

In 2019, Shewchuk renewed Harman's search for a Senior Director of Content. (See id. ¶ 98) Among other qualifications, the role required

> ten years as a leader in multichannel content creation (publishing, journalism, etc.); ten years of creating compelling messages for different external and internal target demographics; ten years of leadership (including remote teams) in objective setting, performance management and selection; issues management/crisis communications experience; and international organization experience.

(Id. ¶ 111) "DiBenedetto believed the Senior Director of Content role that was advertised in 2018 under Davis and the 2019 role that was advertised under Shewchuk were basically the same." (Id. ¶ 98)

In a May 1, 2019 email to Plaintiff, Jennifer Jacob reiterated her interest in the Senior Director of Content role, writing: "I'd love to catch up with you and learn what the status of this role is and how I may be able to be considered to join your team." (Id. ¶ 99) On May 10, 2019, Plaintiff responded that she would be "happy to make introductions to Darrin Shewchuk who is now leading that search" and would be "happy to pass [Jacob's CV] along." (Id. ¶ 100) Plaintiff subsequently sent Jacob's resume to Shewchuk. (Id. ¶ 101) Despite this correspondence, Plaintiff claims that she "was not aware that the Senior Director of Content position had been posted in 2019," and asserts that Shewchuk was interviewing candidates "behind her back." (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 102)

Shewchuk and other members of his team interviewed approximately six candidates for the Senior Director of Content role, including Jennifer Jacob. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 105) Plaintiff was not part of the interview process. (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶¶ 106-07) Plaintiff complains that when she asked Shewchuk about the Senior Director position, "at no time did he say to me, Annette, I'm opening the job. You should interview." (Id. ¶ 264)

In January 2020, Shewchuk hired Jennifer Jacob to be the Senior Director of Content. When hired, Jacob had "more than 20 years of experience building, promoting, and protecting top consumer and corporate brands." (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 114) Her experience included "[leading] and manag[ing] corporate communications, employee engagement, public relations, corporate affairs, marketing communications, sustainability,

corporate branding, and organizational change management." (Id. ¶ 115) According to Plaintiff, Shewchuk said that he hired Jacob because she "is going to have a lot of energy" and would "bring new thoughts, process, vision and modernizing things." (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 262)

### F. Plaintiff Requests that Her Job Be Regraded

In 2020, Plaintiff told Shewchuk that she wanted her CSR Manager position "re-review[ed]."[6] (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 78-80) Shewchuk encouraged Plaintiff to contact Human Resources to initiate the regrading process. (Id. ¶ 80) DiBenedetto then contacted Ashley Gang, Senior HR Generalist, to request that her job be regraded. (Id. ¶ 82; Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 79) Gang's role "was to collect information and then pass it on to Anthony Renella in Global Rewards who would make the decision regarding the regrading." (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 83)

On February 11, 2020, Gang asked Plaintiff to revise her original job description. (Id. ¶ 84) Gang explained that she would discuss the regrading process with Shewchuk, edit the job description, and then submit the description to the Global Rewards Team for regrading. (Id.) Plaintiff told Gang that Shewchuk was "informed and, as always, supportive." (DiBenedetto Decl., Ex. 1 (Dkt. No. 77-1) at 212:8-9; see also Shewchuk Decl. (Dkt. No. 70) ¶ 30) Thereafter, Gang emailed Shewchuk about the regrading of Plaintiff's position, stating that "[w]e'd

---

[6] Plaintiff contends that she raised the issue of "reviewing" her position as early as 2019. (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 78 (citing DiBenedetto Decl. (Dkt. No. 77) ¶¶ 18, 27)). The evidence indicates that when Plaintiff was first hired for the full-time position, she requested that she be given a more senior role. (Id. ¶ 68) According to Plaintiff's declaration, after she accepted the CSR Manager position, Plaintiff inquired about "elevating" her role "periodically." (DiBenedetto Decl. (Dkt. No. 77) ¶ 27) Contrary to her Amended Rule 56.1 Statement, however, Plaintiff's declaration does not suggest that she sought a formal "regrade" of her position until 2020. Indeed, Plaintiff's declaration states that "in February 2020, [Plaintiff] told Shewchuk that [she] thought it was time that we re-evaluated my job grade and title." (Id. ¶ 47)

ultimately need Global Rewards to then regrade it, but I did tell [DiBenedetto that] I'd like you to look at it first for alignment, and to confirm you don't have any additional inputs." (DiBenedetto Decl., Ex. Q.1 (Dkt. No. 77-21) at 2)

On February 24, 2020, Plaintiff provided a revised job description to Gang. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 87) After review, the Global Rewards Team decided that Plaintiff's role "was properly scoped and graded at Grade 12, and DiBenedetto was appropriately paid." (Id. ¶ 88)

Defendant notes that another employee, Peter Bohjalian – who served as Manager, Social Media & Digital Communications – likewise sought to have his job regraded.[7] (Id. ¶ 89 (citing Shewchuk Decl. (Dkt. No. 70) ¶ 11)) As in Plaintiff's case, the Global Rewards Team decided that Bohjalian's role was properly scoped and did not assign it a new grade.[8] (Id. ¶ 90 (citing Shewchuk Decl. (Dkt. No. 70) ¶ 11))

### G. Plaintiff's Sustainability Responsibilities are Reassigned

In 2020, Harman began a restructuring process. (Id. ¶ 127) As part of that effort, "Harman shifted from an organization that did sustainability work but was not strongly focused on it[,] to making sustainability a significant priority and mandating sustainability targets for executives." (Id. ¶ 152)

---

7 The record does not disclose when Bohjalian sought to have his role regraded, or why the Global Rewards Team declined to regrade his position.

8 Plaintiff disputes this fact because – when Shewchuk was asked at deposition whether he had been involved in the regrading of any other employee's position – he did not mention Bohjalian. (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶¶ 89-90) But Shewchuk does not suggest in his declaration that he was "involved" in the regrading of Bohjalian's position. Shewchuk instead says that he was "aware" that Bohjalian had made such a request, and that the Global Rewards Team decided that his position was appropriately graded. (Shewchuk Decl. (Dkt. No. 70) ¶ 11)

In January 2021, Shewchuk reorganized the Corporate Communications team. (Id. ¶¶ 151, 153) The parties dispute whether Shewchuk was motivated by a desire to "better meet the new sustainability deliverables" (id.) or, as Plaintiff asserts, "by age and gender discrimination." (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 153) In any event, Shewchuk changed the roles and responsibilities of a number of employees, including that of Plaintiff, Jennifer Jacob, and Tom Mooney. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 154)

For example, Mooney – who previously served as a Policy Director (id. ¶ 15) – was made Senior Director, Policy and Communications. (Shewchuk Decl. (Dkt. No. 70) ¶ 64; Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 265) He and Plaintiff were "tasked with . . . focusing on environmental, social, governance, and data strategy" (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 156), with Mooney leading the new initiative. (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 265)[9] According to Plaintiff, although she "had successfully developed" the team's sustainability work "[f]or years," Shewchuk placed Mooney in charge because he "had a 'refreshed' way of speaking to leadership, was 'well poised, he knows the fellas.'" (Id.) Shewchuk also "frequently comment[ed] that the majority of the leadership team was 90% male." (Id.)

Because Plaintiff would now report to Mooney on sustainability matters, Mooney and Plaintiff discussed a new title and description for her role (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 159), with Mooney ultimately deciding on "Senior Sustainability Data & Insights Lead." (Id. ¶ 160) In her new position, Plaintiff "would focus on engaging cross-functionally across the organization, and streamline, standardize, and improve ESG [Environmental, Social, and Governance] data and insights." (Id.) According to Plaintiff, "her Sustainability work was given

---

[9] Mooney was born on December 14, 1980. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶¶ 137)

to Mooney," and her new position was merely a "data-oriented role." (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 159)

### H. Plaintiff Complains About Her New Role

On January 15, 2021, Plaintiff told Allison Garrigan in Human Resources that "she was upset and unhappy that her job was changing. She felt Harman Inspired work was moving to Jacob and she was not happy that she would now have to work with Mooney."[10] (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 170) Plaintiff told Garrigan that "Mooney would be taking over work she had developed, Mooney was being a 'bully', and she felt she was being relegated to a back seat role." (Id. ¶ 173) Plaintiff also disclosed that she was facing certain "personal challenges . . . , such as her mother suffering from dementia." (Id. ¶ 174)

Garrigan decided to investigate Plaintiff's complaint. (Id. ¶ 176) As part of that inquiry, on February 2, 2021, Garrigan and Lori Lampman – Harman's Chief Human Resources Officer – met with Plaintiff to discuss her concerns. (Id. ¶ 178) At that meeting, Plaintiff expressed concerns about

> (1) changes in the organization setup, (2) the change in her role of "Corporate Social Responsibility" to "Sustainability Data & Insights", (3) her concern that she was moving to what she referred to as a "data role," which she believed was not as significant as her prior role, and (4) perceived bullying behavior by Mooney.

(Id. ¶ 179)

Plaintiff also complained that her role had not been properly explained to her; that Jennifer Jacob was taking credit for DiBenedetto's work; and that Plaintiff's contributions to the Company's environmental, social, and governance goals had not been acknowledged. (Id. ¶ 180)

---

[10] "Harman Inspired" was a program that "involved community giving." Id. ¶ 171. Employees tasked with Harman Inspired work "focus[ed] on corporate giving, employee/community engagement, and corporate communications." Id. ¶ 156.

In support of her complaints, Plaintiff provided Garrigan with copies of certain email communications among members of the Corporate Communications team. (Id. ¶¶ 182-89) In addition to reviewing these materials, Lampman and Garrigan spoke with Mooney, Shewchuk, Jacob, Sandra Martinez (Vice President of Human Resources), and Harry Andersson (Harman's Head of Operations) about Plaintiff's concerns. (Id. ¶¶ 190-93 (citing Lampman Decl. (Dkt. No. 68) ¶¶ 47, 55))

In order to understand how Plaintiff's previous position as CSR Manager compared to her new role as Senior Sustainability Data and Insights Lead, Chief Human Resources Officer Lampman submitted the new role for grading by the Global Rewards Team. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶¶ 195-99) The Global Rewards Team assigned the Senior Sustainability Data and Insights Lead position a grade of twelve – the same grade assigned to the CSR Manager position. (Id. ¶ 199) Accordingly, Plaintiff's salary did not change. (Id. ¶ 200)

After considering Plaintiff's complaints, the materials she provided, and the two job descriptions (and corresponding grade levels, which were the same), and after interviewing the co-workers listed above, Lampman and Garrigan "determined [that] the shift in [Plaintiff's] roles and responsibilities was to meet an evolving business need." (Id. ¶ 203 (citing Lampman Decl. (Dkt. No. 68) ¶¶ 65))

On February 23, 2021, Lampman and Garrigan informed Plaintiff that they had investigated her concerns and "did not find [that] anything inappropriate had occurred." (Id. ¶ 205) Lampman and Garrigan explained that Plaintiff's new position "was a lateral job change that generally aligned" with her prior work, and that it was assigned the same grade and salary as her prior position. (Id. ¶ 206) Lampman also explained that she "understood DiBenedetto and Mooney were having some communication challenges . . . and that [the Human Resources

department] wanted to work with them on how to help foster a positive relationship." (Id. ¶ 213) Lampman and Garrigan subsequently spoke with Mooney "regarding his communication style with DiBenedetto and informed him [that] he needed to be aware of how his communication style impacted all members of his team, and that going forward he should ensure his communication style is positive and respectful." (Id. ¶ 214 (citing Lampman Decl. (Dkt. No. 68) ¶¶ 70))

## I. Plaintiff Takes Medical Leave

Plaintiff suffers from an autoimmune disease. (Id. ¶ 216) In 2021, Plaintiff told Lampman "that work was causing [her] stress[,] and that stress negatively impacted other personal matters such as her daughter's wedding[,] because DiBenedetto began to lose her hair." (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 217) On March 30, 2021, before accepting her new position as Senior Sustainability Data and Insights Lead, Plaintiff went on medical leave. (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 218) Plaintiff alleges that her "need for a medical leave was related to the discrimination she experienced at work, not based on her actual duties." (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 219)

Plaintiff received short-term disability benefits while she was on leave pursuant to the Family Medical Leave Act ("FMLA"). (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 221) At the conclusion of Plaintiff's FMLA and other short-term disability leaves, Plaintiff began to receive long-term disability benefits. (Id. ¶ 223) "The Social Security Administration determined DiBenedetto to be totally disabled and unable to work." (Id. ¶ 224) "Harman kept DiBenedetto's position open for nearly two years in hopes she would return to work." (Id. ¶ 228) Plaintiff's employment was ultimately terminated on January 31, 2023, nearly two years after she first took medical leave. (Id. ¶ 229)

## II. PROCEDURAL HISTORY

The Complaint was filed on March 11, 2022. (Dkt. No. 1)

On January 19, 2024, Defendant moved for summary judgment. (Def. Mot. for Sum. J. (Dkt. No. 64))

On February 16, 2024, Plaintiff submitted her opposition (Pltf. Opp. Br. (Dkt. No. 75)), along with a response to Defendant's Local Rule 56.1 Statement. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 76))

On February 26, 2024, Defendant filed its reply. (Def. Reply (Dkt. No. 72)) Defendant also moved to strike portions of Plaintiff's Response to Defendant's Local Rule 56.1 Statement. (Dkt. No. 73)

On February 27, 2024, Plaintiff moved to strike Defendant's Local Rule 56.1 Reply or, in the alternative, for permission to file a sur-reply Local Rule 56.1 statement. (Dkt. No. 79) Defendant opposed both requests. (Dkt. No. 80)

In a February 29, 2024 order, this Court struck Plaintiff's Local Rule 56.1 Response (Dkt. No. 76) and Defendant's Local Rule 56.1 Reply (Dkt. No. 73), finding that neither complied with Local Rule 56.1. (Order (Dkt. No. 81)) The Court directed Plaintiff to "file a Local Rule 56.1 response that fully complies with the Rule and the case law addressing it." (Id. at 6) To the extent Plaintiff listed additional material facts in her amended Local Rule 56.1 Response, the Court granted Defendant permission to file a reply. (Id.)

On March 7, 2024, Plaintiff filed an Amended Local Rule 56.1 Response. (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82)) On March 14, 2024, Defendant requested leave to file a supplemental declaration, solely for the purpose of introducing materials that are cited in Defendant's reply brief but have not been submitted to the Court as exhibits. (Dkt. No. 83) On

March 19, 2024, this Court granted Defendant's request. (Dkt. No. 85) On March 21, 2024, Defendant filed the Declaration of Ivie A. Serioux. (Dkt. No. 86)

## DISCUSSION

In the Complaint's First Cause of Action, Plaintiff alleges that she was subjected to age discrimination at Harman, in violation of the ADEA, 29 U.S.C. § 623(a)(1) et seq., and in the Second Cause of Action, Plaintiff alleges that she was subjected to sex discrimination at Harmon, in violation of Title VII, 42 U.S.C. § 2000e-2. (See Cmplt. (Dkt. No. 1) ¶¶ 67-84) It is not entirely clear from the Complaint what theories of liability Plaintiff is pursuing, but this Court construes the First Cause of Action as alleging a failure to promote theory of liability, and construes the Second Cause of Action as alleging a discriminatory demotion theory of liability.

In moving for summary judgment, Defendant contends that Plaintiff has not proffered evidence sufficient to create a material issue of fact as to any of her claims. (See Def. Br. (Dkt. No. 65) at 9)

## I. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108,

1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, "'[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Moreover, "'[t]he principles governing admissibility of evidence do not change on a motion for summary judgment[,]' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

"'Where, as here, the burden of persuasion at trial would be on the non-moving party[,] . . . the party moving for summary judgment may satisfy [its] burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" Nick's Garage,

Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)). In ruling on a summary judgment motion, a court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

"In cases that involve claims of discrimination, courts must use 'an extra measure of caution' in determining whether to grant summary judgment 'because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions.'" Fitchett v. City of New York, 18 Civ. 8144 (PAE), 2021 WL 964972, *8 (S.D.N.Y. Mar. 15, 2021) (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)). However, "'the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation.'" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (omission in original) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). As in any other case, a plaintiff in a discrimination case "must 'do more than simply show that there is some metaphysical doubt as to the material facts[.]' . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "Mere conclusory statements, conjecture or speculation cannot by themselves create a genuine issue of material fact." Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Risco v. McHugh, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) ("'[E]ven in the discrimination context, [ ] a plaintiff must provide more than conclusory allegations to

resist a motion for summary judgment' . . . [and the] 'nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful.'") (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) and Jeffreys, 426 F.3d at 554) (internal quotation marks omitted).

**B. Discrimination Claims under the ADEA and Title VII**

The ADEA makes it unlawful for an employer to "discriminate against any individual . . . because of such individual's age" 29 U.S.C. § 623(a)(1), and Title VII makes it unlawful for an employer to "discriminate against any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1)).

"Discrimination claims under Title VII [and] the ADEA . . . are analyzed under the McDonnell Douglas burden-shifting framework." Carr v. N.Y.C. Transit Authority, 76 F.4th 172, 177 (2d Cir. 2023) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 129 (2d Cir. 2012); Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012)). Under this familiar framework,

> plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action. If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Holcomb, 521 F.3d at 138 (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)) (internal citations omitted). The Second Circuit has "consistently applied McDonnell Douglas at the summary judgment stage[.]" Bart v. Golub Corp., 96 F.4th 566, 573 (2d Cir. 2024).

At summary judgment, in order to establish a prima facie case of discrimination under the ADEA or Title VII, Plaintiff must offer evidence that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." Leibowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009).

"The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." Walsh v. N.Y.C. Housing Auth., 828 F.3d 70, 75 (2d Cir. 2016) (quoting Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998) (internal quotation marks omitted)). Although the standard for a prima facie case is low, "a plaintiff's case must fail if she cannot carry this preliminary burden." Beyer, 524 F.3d at 163.

"[O]nce a plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's action against the employee." Carr, 76 F.4th 172, 177 (2d Cir. 2023) (quoting Truitt v. Salisbury Bank & Tr. Co., 52 F.4th 80, 86-87 (2d Cir. 2022) (internal quotation marks and alterations omitted)).

If the employer satisfies its burden, the burden "shifts back to the employee to show that the employer's articulated reason is pretext for discrimination." Carr, 76 F.4th at 177 (quoting Truitt, 52 F.4th at 86-87).

The ADEA and Title VII differ, however, as to the nature of plaintiff's burden to show pretext at this stage of the McDonnell Douglas analysis. For Title VII discrimination claims, plaintiff need only "show that unlawful discrimination was a 'motivating factor' in the employment action." Delville v. Firmenich Inc., 920 F. Supp. 2d 446, 458 n.8 (S.D.N.Y. Jan. 31, 2013). By contrast, for ADEA discrimination claims, plaintiff "must demonstrate that age was

not just a motivating factor behind the adverse action, but rather the 'but-for' cause of it." Leibowitz, 584 F.3d at 498 n.2 (citing Gross v. FBL Financial Services, Inc., 557 U.S. 167, 175-78 (2009)). "To show ['but-for' cause], the plaintiff must plead facts suggesting 'that age was the reason that the employer decided to act.'" Santiago v. ACACIA Network, Inc., 634 F. Supp. 3d 143, 157 (S.D.N.Y. 2022) (quoting Gross, 557 U.S. at 176).

In determining whether a defendant's stated reasons are pretextual, courts are "decidedly not interested in the truth of the allegations against plaintiff," but in "what '*motivated* the employer.'" McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)) (emphasis in McPherson); see also Moore v. Kingsbrook Jewish Med. Ctr., No. 11 Civ. 3625 (MKB), 2013 WL 3968748, at *13 (E.D.N.Y. July 30, 2013) ("[T]hat an employee 'disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext . . . .'") (quoting Grant v. Roche Diagnostics Corp., No. 09-CV-1540, 2011 WL 3040913, at *11 (E.D.N.Y. July 20, 2011)).

Under either the ADEA or Title VII standard, "plaintiff bears 'the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" Carr, 76 F.4th at 177 (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 256 (1981)).

## II. ADEA FAILURE TO PROMOTE CLAIM

Defendant argues that Plaintiff has not established a prima facie case of age discrimination with respect to the alleged failure to promote Plaintiff to Senior Director of Content, because she did not apply for the position and, in any event, was not qualified for that position. (Def. Br. (Dkt. No. 65) at 16-25) Moreover, the person Harman ultimately hired for that position belongs to the same protected class as Plaintiff. (Id. at 9-15)

Plaintiff argues that – although she "explicitly and repeatedly" indicated to Shewchuk her interest in the position – he "actively hid his actions in filling that role," "*because* [Plaintiff] was qualified and he wanted someone younger." (Pltf. Opp. (Dkt. No. 75) at 24, 26 (emphasis in original))

**A. Prima Facie Case**

To establish a prima facie case of age discrimination under a failure to promote theory, Plaintiff must offer evidence that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was denied the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." Fletcher v. ABM Building Value, 14 Civ. 4712 (NRB), 2018 WL 1801310, at *8 (S.D.N.Y. Mar. 28, 2018) (citing Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 80 (2d Cir. 2009)). "'[T]he fourth element is also established if the employer fills the position with a person outside the protected class who was similarly or less qualified than the plaintiff.'" Turner v. Wilkie, No. 18CV4038 (LMS), 2020 WL 5371023, at *7 (S.D.N.Y. Sept. 8, 2020) (quoting Yu v. New York City Housing Development Corp., 494 F. App'x 122, 125 n.5 (2d Cir. 2012)) (further citation and internal quotation marks omitted)).

Finally, "[t]o establish a prima facie case, a plaintiff claiming a failure to promote [because of age] must show 'she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.'" Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP, 869 F. Supp. 2d 378, 398 (S.D.N.Y. 2012) (quoting Brown v. Coach Stores, 163 F.3d 706, 710 (2d Cir. 1998) (further quotation omitted)); see also Isaac v. City of New York, 701 F. Supp. 2d 477, 486 (S.D.N.Y. 2010) ("in order to set forth a prima facie case" a plaintiff alleging failure to promote must demonstrate that the failure to promote "took place in circumstances giving rise to an inference

of age discrimination"); Moorehead v. N.Y.C. Transit Auth., 385 F. Supp. 2d 248, (S.D.N.Y. 2005) ("With respect to a discriminatory failure to promote claim [under the ADEA or Title VII], a plaintiff must first establish a prima facie case of unlawful discrimination by showing that (1) he is a member of a protected category, (2) he applied for an available position, (3) he was qualified for the position, and (4) he was rejected under circumstances that give rise to an inference of discrimination.").

Here, the first element of a prima facie case – membership in the protected class – is not in dispute. The parties dispute the remaining elements of a prima facie case, including whether Plaintiff was qualified for the Senior Director of Content position, whether she applied for and was denied the position, and whether – assuming that she applied for and was denied the position – the denial took place under circumstances giving rise to an inference of discrimination.

#### 1. Whether Plaintiff Was Qualified for the Senior Director of Content Position

Defendant argues that Plaintiff was not qualified for the Senior Director of Content position because "Plaintiff's entire professional background [was] in Human Resources," and Plaintiff did not have the "ten years of experience (or any) in the corporate communications and content strategy space" that the role expressly required. (Def. Br. (Dkt. No. 65) at 20) Plaintiff responds that she was "already performing many of the functions that the role required" (Pltf. Opp. (Dkt. No. 75) at 25), and complains that – in addressing Plaintiff's qualifications – Defendant relies on an "outdated resume" that was "not tailored to show how DiBenedetto was qualified for the Senior Director position." (Id. at 19, 26)

For purposes of an ADEA claim, "being 'qualified' refers to the criteria the employer has specified for the position." Wilson v. N.Y.C. Housing Auth., No. 05 Civ. 6538

DF, 2007 WL 1032262, at *6 (S.D.N.Y. Apr. 2, 2007) (quoting Thornley v. Penton Pub., Inc., 104 F.3d 26, 29 (2d Cir. 1997). To establish a prima facie case, a plaintiff need only make a "'minimal'" showing that she "'possesses the basic skills necessary for performance of the job.'" James v. Port Auth. Police Dep't, 22 Civ. 2463 (PGG), 2025 WL 966016, at *10 (S.D.N.Y. Mar. 31, 2025) (quoting Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 147 (2d Cir. 2012) (quoting Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001))). A plaintiff's subjective belief that she is qualified for a position, however, is not sufficient to establish a prima facie case. See Rackley v. Constellis, LLC, 1:22-cv-4066-GHW, 2024 WL 3824108 at *2 (S.D.N.Y Aug. 14, 2024) (concluding that magistrate judge's report and recommendation "rightly disregarded arguments based on the plaintiff's 'subjective belief' about what the job should require").

Aside from the conclusory assertion that Plaintiff was "already performing many of the functions that the role required," Plaintiff does not explain how her credentials and experience – including the work she performed that allegedly is "not representative of strictly [human resources] work" – meets the criteria Harman specified for the Senior Director of Content position.

It is undisputed that Harman's job description for the Senior Director of Content Position in 2019 required

> ten years as a leader in multichannel content creation (publishing, journalism, etc.); ten years of creating compelling messages for different external and internal target demographics; ten years of leadership (including remote teams) in objective setting, performance management and selection; issues management/crisis communications experience; and international organization experience.

(Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 111)

But Plaintiff does not argue that her work experience included "ten years as a leader in multichannel content creation," "ten years of creating compelling messages for

different external and internal target demographics," "ten years of leadership (including [with respect to] remote teams) in objective setting, performance management and selection," experience in "management/crisis communications," and experience in "international organization." (See Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 111); see also Day v. N.Y.C. Dep't of Consumer Affs., 10 Civ. 4888 (RWS), 2016 WL 1070843, at *6 (S.D.N.Y. Mar. 15, 2016) (finding plaintiff's conclusory allegation insufficient to establish a prima facie case that she was qualified).

And while Plaintiff asserts that "Shewchuk drafted the job description for Jacob, [and that] a jury could find that he wrote it in a way that would intentionally exclude DiBenedetto from consideration" (Pltf. Opp. (Dkt. No. 75) at 26), Plaintiff concedes that "the Senior Director of Content role that was advertised in 2018 under Davis and the 2019 role that was advertised under Shewchuk were basically the same." (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 98) Accordingly, Plaintiff has not proffered evidence sufficient to create a material issue of fact as to whether the job description was crafted by Shewchuk so as to exclude Plaintiff.

Acknowledging the de minimis standard applicable to the prima facie case determination, this Court nonetheless concludes that Plaintiff has not met this standard. Plaintiff has not made out a prima facie case of age discrimination under the ADEA because she was not "qualified" for the Senior Director of Content position, given that she lacked the express qualifications for the role. See Santos v. Engelhard Corp., No. 05 Civ. 203 (PGG), 2009 WL 2432736, at *9 (S.D.N.Y. Aug. 6, 2009) (finding that plaintiff was not qualified because "he did not meet the requirements for the position as listed" in the original job posting and in the revised job description).

**2. Whether Plaintiff Applied for and Was Denied the Senior Director of Content Position**

As discussed above, in order to establish a prima facie case of age discrimination under the ADEA, Plaintiff must offer evidence that she applied for the position at issue and was denied that position. Here, Plaintiff has not proffered evidence of either element.

As to whether Plaintiff applied for the Senior Director of Content position, Plaintiff contends in her opposition brief that she had "made her interest in a Director/Senior Director role known since before she started working at Harman full time[,] . . . [and] continued to ask Shewchuk about that open position" throughout her employment. (Pltf. Opp. (Dkt. No. 75) at 23) Plaintiff goes on to state in her brief that Shewchuk told Plaintiff "that he had not decided to fill the role yet." (Id.)

"To establish a prima facie case of discriminatory failure to promote, a plaintiff must 'allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion.'" Kinsella v. Rumsfeld, 320 F.3d 309, 314 (2d Cir. 2003) (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998)). "But, a plaintiff is excused from showing that she applied for a specific promotional opportunity when the plaintiff demonstrates that '(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer.'" Griffith v. Metro. Transit Auth.-N.Y.C. Transit, 19 Civ. 6234 (AT), 2022 WL 845786, at *7 (S.D.N.Y. Mar. 22, 2022) (quoting Petrosino v. Bell Atlantic, 385 F.3d 210, 226 (2d Cir. 2004)).

Here, Plaintiff concedes that she did not apply for the Senior Director of Content position. (See Pltf. Opp. (Dkt. No. 75) at 20, 23; Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 124) While Plaintiff states that she made repeated inquiries about the role, Plaintiff has not

offered evidence that she "attempted to apply for [the Senior Director of Content position] through informal procedures endorsed by the employer." Petrosino, 385 F.3d at 226.

Plaintiff also concedes that she was aware that Shewchuk was seeking to hire for this position. (See Pltf. Opp. (Dkt. No. 75) at 22) Indeed, when Jennifer Jacob asked Plaintiff about applying for the Senior Director of Content position, Plaintiff responded: "I am happy to make introductions to Darrin Shewchuk who is now leading that search." (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 100) Plaintiff subsequently sent Jacob's resume to Shewchuk. (Id. ¶ 101) Accordingly, no reasonable jury could find that Plaintiff was unaware that Shewchuk was seeking to hire for the Senior Director of Content position.

Moreover, Plaintiff's expression of interest in the position is not sufficient to establish a prima facie case of age discrimination. See Stanley v. City Univ. of N.Y., 18 Civ. 4844 (PAE), 2023 WL 2714181, at *20 (S.D.N.Y. Mar. 30, 2023) (plaintiff could not make out prima facie case where the complaint did not allege that the plaintiff applied for any position, or that he was entitled to be considered for any such position); Lopez v. N.Y.C. Dep't of Educ., No. 17-CV-9205 (RA), 2020 WL 4340947, at *6 (S.D.N.Y. July 28, 2020) ("Because Plaintiff has not adequately pled that he applied for and was rejected from any particular position, his assertion that younger teachers . . . were promoted 'despite the fact that they were less-experienced and less-qualified,' is insufficient to support a failure-to-promote claim." (internal citations omitted)).

Because Plaintiff knew that Harman was seeking to hire for the Senior Director of Content position and made no attempt to apply for that position, either formally or informally, she has not established either that she applied for the position at issue or was denied that

position. As a result, Plaintiff cannot make out a prima facie case of discriminatory failure to promote.

### 3. Inference of Discrimination

As discussed above, "[t]o establish a prima facie case, a plaintiff claiming a failure to promote [because of age] must show 'she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.'" Zito, 869 F. Supp. 2d at 398 (quoting Brown, 163 F.3d at 710).

Plaintiff has not satisfied this element because – having not applied for the Senior Director of Content position – she cannot establish that she was "rejected" for the position. But even if Plaintiff was qualified for the position, had applied for the position, and was rejected for the position, any such rejection would not have taken place under circumstances giving rise to an inference of discrimination.

#### a. Alleged Remarks Showing Discriminatory Animus

To establish an inference of discrimination, Plaintiff argues that Shewchuk made remarks evidencing his "clear bias against DiBenedetto because of her age" (Pltf. Opp. (Dkt. No. 75) at 16), such as: "You remember, back in the day . . . ,"; "We don't recover like we did when we were younger"; and "Don't make more work for yourself. By the time we get to this, you'll be gone." (Id. at 16-17 (citing DiBenedetto Decl. (Dkt. No. 77) ¶ 31)) Plaintiff also asserts that Shewchuk described Harman's image in the marketplace as "fast cars, quick technology, young and aloof" and "like a sexy car company," and referred to new hires as "hungry tigers" and "young cubs." (Id. (citing DiBenedetto Decl. (Dkt. No. 77) ¶ 31))

Shewchuk denies ever having made the challenged remarks, but Defendant argues that, "even if he had, . . . they would not suffice to support a claim of age discrimination [because

they] were, at most, stray comments that do not constitute sufficient evidence to show an inference of discrimination." (Def. Br. (Dkt. No. 65) at 30)

Discriminatory intent "may be inferred from remarks made by the employer." Quinby v. WestLB AG, No. 04 Civ.7406 WHP, 2007 WL 1153994, at *6 (S.D.N.Y. Apr. 19, 2007) (citing Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 124 (2d Cir. 2004); Holtz v. Rockefeller & Co., 258 F.3d 62, 77-78 (2d Cir. 2001)). "However, mere 'stray remarks' are insufficient to create a material issue of fact to defeat summary judgment." Id. (quoting Tomassi v. Insignia Fin. Group, 478 F.3d 111 (2d Cir. 2007) abrogated on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78, (2009)).

In determining whether a remark is probative of discriminatory intent or constitutes a non-probative "stray remark," courts consider the following:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Summit v. Equinox Holdings, Inc., 20 Civ. 4905 (PAE), 2022 WL 2872273, at *13 (S.D.N.Y. July 21, 2022) (quoting Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149 (2d Cir. 2010)).

"The more removed remarks are from an employer's adverse action, the more likely they can be considered non-probative 'stray remarks.'" Id. (quoting Henry, 616 F.3d at 149) (citing Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) ("[S]tray remarks, even if made by a decision maker, do not constitute sufficient evidence to make out a case of employment discrimination."); Campbell v. All. Nat'l Inc., 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision

process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.")).

Here, Plaintiff alleges that Shewchuk – who is the decision-maker – made the allegedly discriminatory remarks. And one of the remarks was allegedly made when Plaintiff spoke with Shewchuk about his decision to hire Jacob for the Senior Director of Content. Shewchuk allegedly said, "Annette, just think about it. Jen Jacob is going to have a lot of energy. She's going to bring new thoughts, process, vision and modernizing things." (Pltf. Opp. (Dkt. No. 75) at 10, 20; DiBenedetto Decl. (Dkt. No. 77) ¶ 41)

But an expressed preference for someone with "energy" and "new thoughts," and who will "moderniz[e] things," is not probative of age animus. See, e.g., Carter v. Verizon, No. 13 Civ. 7579(KPF), 2015 WL 247344, at *6 (S.D.N.Y. Jan. 20, 2015) (ruling on a motion to dismiss that an employer's remark that she "wanted 'new blood'" did not give rise to an inference of discrimination) (collecting cases) (citing, inter alia, Fortier v. Ameritech Mobile Commc'ns, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998) (supervisor's statements that it was "time for 'new blood,'" and that a new hire "had a lot of energy" and would be a "quick study," could not support an inference of age discrimination)); see also Bluight v. Consolidated Edison Co. of New York, Inc., No. 00CIV3309 (GEL), 2002 WL 188349, at *7 (S.D.N.Y. Feb. 6, 2002) (noting that "a preference for 'young thinking' employees [is not] the same as a preference for the merely young").

Moreover, only one alleged remark cited by Plaintiff is tied to a specific time period. In October 2019, Shewchuk allegedly told Plaintiff to "bide [her] time" and "coast" at Harman. (DiBenedetto Decl. (Dkt. No. 77) ¶ 31) Even if this comment – made approximately three months before Shewchuk hired Jacob – could be viewed as sufficiently close in time to be

probative of discriminatory intent (see Osborne v. Moody's Investors Service, Inc., 1:17-cv-01859 (ALC), 2018 WL 1441392, at *4 (S.D.N.Y. Mar. 22, 2018) ("District courts in this Circuit have found that a three month lapse between alleged discriminatory statements and an adverse employee action is too long a gap to find the remark probative of discrimination.") (quoting Sethi v. Narod, 12 F. Supp. 3d 505, 540 (E.D.N.Y. 2014)), it is not probative of age animus. Indeed, telling an employee to "bide their time" and "coast" at work has no connection to age whatsoever.

As to the remaining alleged remarks, Plaintiff does not offer evidence as to when they were made, and has not linked them in any fashion to an employment decision. Absent a nexus to the decision-making process, there is no evidence that Shewchuk's alleged remarks implicating age were anything other than "stray remarks." Smith v. N.Y. & Presbyterian Hosp., 440 F. Supp. 3d 303, 338 (S.D.N.Y. 2020) (finding that supervisor's alleged statement was non-probative because Plaintiff "present[ed] no admissible evidence as to when this statement was made"); Arnow v. Aeroflot Russian Airlines, 980 F. Supp. 2d 477, 484-85 (S.D.N.Y. 2013) (finding alleged discriminatory remark not probative where there was no evidence that the remark "was made at a time and in a manner to suggest that [the defendant] was describing his motivations for whom to lay off").

In sum, Shewchuk's remarks are not sufficient to demonstrate that any actions taken with respect to Plaintiff took place under circumstances giving rise to an inference of discrimination. Even if Shewchuk's remarks were probative of discriminatory intent – which they are not – any such inference is undermined by the factors set forth below.

**b. Actors in the Same Protected Class**

Defendant argues that Plaintiff cannot establish age-based discriminatory intent because "she was over 40 when she was hired (i.e., 54 years old)." (Def. Br. (Dkt. No. 65) at 26-

27) Moreover, at all relevant times, both Shewchuk and Jacob were more than forty years old. (Def. Br. (Dkt. No. 65) at 26-27 (citing Palak v. St. Francis Hosp., No. 14-CV-4383, 2015 WL 3682805, at *8 (E.D.N.Y. June 12, 2015); Ulrich v. Moody's Corp., 13-CV-8 (VSB), 2017 WL 1232709, *11 (S.D.N.Y. Mar. 31, 2017); Toussaint v. NY Dialysis Servs., 230 F. Supp.3d 198, 212-13 (S.D.N.Y. 2017)))

Plaintiff does not respond to Defendant's argument that – at the time Shewchuk hired Plaintiff as CSR Manager – Plaintiff was fifty-four years old, and that this fact undermines any inference of age animus. (See Def. Br. (Dkt. No. 65) at 26-27) Where, as here, "an employee is already a member of the protected class when hired, any inference of age discrimination when her employment is terminated," or when she suffers an adverse employment action, "is undermined." Stinson v. Morningstar Credit Ratings, LLC, Case No.1:22-cv-06164 (JLR), 2024 WL 3848515, at *14 (S.D.N.Y Aug. 16, 2024) (quoting Snowden v. Trs. of Columbia Univ., No. 12-cv-03095 (GBD), 2014 WL 1274514, at *8 (S.D.N.Y. Mar. 26, 2014), aff'd, 612 F. App'x 7 (2d Cir. 2015) (summary order)).

As to Shewchuk's age at the time he hired Jacob – fifty-five – courts in this Circuit have consistently held that the "inference of age-based animus" is undermined where the decision-maker is over the age of forty at the time of the alleged adverse employment action. See Lyons v. New York Life Insurance Co., 20 Civ. 3120 (PAE), 2022 WL 837202, at *22 (S.D.N.Y. Mar. 21, 2022) ("The age of a plaintiff's supervisors, where also over 40, 'undermines any inference of discrimination.'") (quoting Baguer v. Spanish Broad. Sys., Inc., No. 04 Civ. 8393 (RJS), 2010 WL 2813632, at *15 (S.D.N.Y. My 12, 2010), aff'd, 423 F. App'x 102 (2d Cir. 2011) (summary order)); Broomfield v. Bronx Lebanon Special Care Center, Inc., 16-cv-10047 (ALC) (SLC), 2025 WL 902456, at *8 (S.D.N.Y. Mar. 25, 2025) ("Courts within the Second

Circuit have found that [the] fact that 'the decision makers with regard to plaintiff's firing [ ] were both over forty years old and thus members of the same protected class as plaintiff weakens any inference that the decision to fire plaintiff was based on his age.'") (quoting Testa v. CareFusion, 305 F. Supp. 3d 423, 436 (E.D.N.Y. 2018)).

As to Jacob's age at the time she was hired – forty-six – Plaintiff contends that "Shewchuk, based on what he said to DiBenedetto, clearly saw a difference between Jacob, who he felt had 'energy,' and DiBenedetto, who he saw as from a prior era." (Pltf. Opp. (Dkt. No. 75) at 21-22) As discussed above, however, a preference for a worker with more "energy" is not proof of age animus. And "[a]lthough there is no per se rule in the Second Circuit preventing a plaintiff from establishing a prima facie case of discrimination [where] the employer gave [a] job to another []member of [plaintiff's] protected class, courts routinely hold that it is 'extremely difficult, if not practically impossible,' for plaintiffs to establish a prima facie case in such circumstances." Harriott v. Success Acad. Charter Schs., 22-cv-3037 (ER), 2024 WL 757478, at *9 (S.D.N.Y. Feb. 23, 2024); see also Inguanzo v. Hous. & Servs., Inc., No. 12-CV-8212 (ER), 2014 WL 4678254, at *19 (S.D.N.Y. Sept. 19, 2014) (replacement of plaintiff with a worker who is a member of the same protected class "severely undercuts" discrimination claim).

In sum, the fact that Plaintiff, Shewchuk, and Jacob are all members of the same protected class at all relevant times undermines Plaintiff's ability to establish a prima facie case of age discrimination.

**c. "Same Actor Inference"**

Defendant argues that Plaintiff cannot establish discriminatory intent because the same person – Shewchuk – made the decision to hire Plaintiff and the decision to later hire Jacob. (Def. Br. (Dkt. No. 65) at 26-27 (citing Revere v. Bloomingdale's, Inc., No. 03 CV 5043 (SLT)(WDW), 2006 WL 3314633, at *8 (E.D.N.Y. Nov. 13, 2006))) Defendant thus invokes the

"same actor inference," which provides that "[w]hen the same actor hires a person within the protected class, and then [takes adverse action against] that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'" Fletcher v. ABM Building Value, 14 Civ. 4712 (NRB), 2018 WL 1801310, at *19 (S.D.N.Y. Mar. 28, 2018) (citing Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) (quoting Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997)).

In her opposition, Plaintiff argues that a change in circumstances can negate the same actor inference. (Pltf. Opp. (Dkt. No. 75) at 18 (citing Tirschwell v. Tcw Grp., 194 A.D.3d 665, 666 (1st Dept. 2021); Feingold v. New York, 366 F.3d 138, 155 (2d Cir. 2004); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 138 (2d Cir. 2000))) According to Plaintiff, "Shewchuk only desired to keep DiBenedetto on to perform the work as he began to learn his new role, and always planned on replacing her with younger, 'energetic' employees, which he ultimately did." (Pltf. Opp. (Dkt. No. 75) at 18)

Plaintiff's reliance on Feingold is misplaced. There, the Second Circuit found "changes in circumstances" capable of negating the same actor inference might exist where "a significant amount of time has passed between hiring and firing, presumably because the circumstances evolved as the person aged," or, as in Feingold, where a plaintiff's "complaints of discrimination could be found to have altered the circumstances of his employment." Feingold, 366 F.3d at 154-55. Here, Plaintiff has not alleged any such changes. Indeed, the short time period between Plaintiff's hiring and Jacob's hiring (approximately one year) strengthens the same actor inference. See Fletcher, 2018 WL 1801310, at *19 (finding the "same actor inference" particularly strong where employers fired plaintiff "a mere twenty months after they hired her") (citing Inguanzo, 2014 WL 4678254, at *18 ("In the Second Circuit, there is a strong

inference that discrimination was not a motivating factor in an employment decision where the plaintiff's termination 'occurs within a relatively short time after [her] hiring.'" (quoting Carlton, 202 F.3d at 137); Martin v. State Univ. of N.Y., 704 F. Supp. 2d 202, 225 (E.D.N.Y. 2010) (two years); Pronin v. Raffi Custom Photo Lab., Inc., 383 F. Supp. 2d 628, 639-40 (S.D.N.Y. 2005) (twenty months); Rikhy v. AMC Comp. Corp., No. 01 Civ. 7007(WHP), 2003 WL 1618529, at *5 (S.D.N.Y. Mar. 28, 2003) (two and a half years), aff'd, 95 F. App'x 388 (2d Cir. 2004)).

Tirschwell and Carlton – cited by Plaintiff (Pltf. Opp. (Dkt. No. 75) at 18-19) – are not to the contrary. In Tirschwell, the First Department found the same actor inference "unavailing" where over one and half years had passed between the hiring and firing and "a jury could reasonably conclude that there was a change in circumstances – either due to [Plaintiff's] HR complaint or to [the defendant's] regrets about employing a person who was too 'culturally different.'" Tirschwell, 194 A.D.3d at 666. Plaintiff does not allege that she complained to Human Resources between the time she was hired (January 2019) and the time Jacob was hired (January 2020). Nor does she allege, as explained above, that Shewchuk made discriminatory remarks that "altered the circumstances of [her] employment." See Feingold, 366 F.3d at 155. To the contrary, when Plaintiff requested that her position be regraded, she wrote to Gang that "Shewchuk was 'informed and, as always, supportive.'" (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 85); see Dellaporte v. City University of N.Y., 998 F. Supp. 2d 214, 227 (S.D.N.Y. 2014) (finding that plaintiff's statement that he had a "good rapport" with his supervisor "undercut[] any finding of racial animus") (quoting Liburd v. Bronx Lebanon Hosp. Ctr., No. 07 Civ. 11316(HB), 2009 WL 900739, at *5 (S.D.N.Y. Apr. 3, 2009).

In Carlton, the Second Circuit found the same actor inference "significantly weaken[ed]" where seven years had passed between the hiring and firing. Carlton, 202 F.3d at 138. Here, only one year passed between Shewchuk's hiring of Plaintiff and his hiring of Jacob. Such a short period of time does not negate the same actor inference. See Fletcher, 2018 WL 1801310, at *19.

In sum, Plaintiff does not allege a change in circumstances sufficient to negate the same actor inference.

* * * *

For all these reasons, this Court concludes that Plaintiff has not offered evidence sufficient to demonstrate – even for purposes of establishing a prima facie case – that Shewchuk's failure to hire Plaintiff for the Senior Director of Content position, and decision to hire Jacob, took place under circumstances giving rise to an inference of discrimination.

**B. Articulation of a Legitimate Nondiscriminatory Reason**

As explained above, this Court finds that Plaintiff has not established a prima facie case of age discrimination with respect to the decision to hire Jacob to be Senior Director of Content. Even if Plaintiff had established a prima facie case, however, Defendant has articulated a legitimate, non-discriminatory reason for its decision to hire Jacob. According to Defendant, the decision to hire Jacob "was based upon her extensive corporate communication experience, which aligned perfectly with the responsibilities as described in the Senior Director of Content job description." (Def. R. 56.1 Stmt. (Dkt. No. 66) ¶ 113; see also Def. Br. (Dkt. No. 65) at 19) Meanwhile, Plaintiff lacked the "ten years of experience . . . in the corporate communications and content strategy space" that the role required. (Def. Br. (Dkt. No. 65) at 20) See Carr, 76 F.4th at 177 (finding that "defendants proffered a nondiscriminatory reason for not promoting

[plaintiff] – that the two younger men who Brown hired instead of Carr had worked at the Transit Authority longer, had technical backgrounds she lacked, and interviewed better").

### C. Pretext

Where, as here, "the defendant articulates a nondiscriminatory explanation for the adverse employment action, 'the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Rosas v. Balter Sales Co. Inc., 12-CV-6557 (VSB), 2018 WL 3199253, at *3 (S.D.N.Y. June 29, 2018) (quoting Patterson v. Cty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (internal quotation marks omitted)). Plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (internal quotations omitted). As stated above, for discrimination claims brought under the ADEA, a plaintiff "must demonstrate that age was not just a motivating factor behind the adverse action, but rather the 'but-for' cause of it." Leibowitz, 584 F.3d at 498 n.2 (citing Gross, 557 U.S. at 175-78).

Here, in arguing pretext, Plaintiff relies on the same evidence she cited in attempting to make out a prima facie case. But Plaintiff's subjective belief that Shewchuk "did not view her as having a future with Harman because of her age" (Pltf. Opp. (Dkt. No. 75) at 7) is not sufficient to demonstrate that Defendant's proffered justifications for their actions were a pretext for discrimination. See Gilani v. Teneo, Inc., No. 20-CV-1785 (CS), 2021 WL 3501330, at *18 (S.D.N.Y. Aug. 4, 2021) ("'Plaintiff's subjective belief that he was not treated fairly is simply not enough to demonstrate pretext.'") (quoting Silva v. Peninsula Hotel, 509 F. Supp. 2d 364, 386 (S.D.N.Y. 2007). "Only where an employer's business decision is so implausible as to

call into question its genuineness should [the court] conclude that a reasonable trier of fact could find that it is pretextual." Gilani v. Teneo, Inc., No. 20-CV-1785 (CS), 2021 WL 3501330, at *18 (S.D.N.Y. Aug. 4, 2021) (citing Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 118 (2d Cir. 2010) (summary order)). And absent evidence of bias, a plaintiff must offer concrete evidence of disparate treatment, and cannot rely upon "purely conclusory allegations of discrimination." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

Here, the Court concludes that Plaintiff has not offered evidence sufficient to create a material issue of fact as to whether her age was the "but-for" cause of Shewchuk's decision to hire Jacob for the Senior Director of Content position, and not to promote Plaintiff to that position.

* * * *

For all the reasons stated above, Defendant is entitled to summary judgment on Plaintiff's First Cause of Action under the ADEA.

## III. ADEA AND TITLE VII DISCRIMINATORY DEMOTION CLAIM

Plaintiff argues that Shewchuk engaged in age and gender discrimination when he reassigned her sustainability duties to Mooney, "a man in his late 30s," and subsequently demoted her to "Senior Sustainability Data and Insights Lead." (Pltf. Opp. (Dkt. No. 75) at 27)

In seeking summary judgment on Plaintiff's ADEA and Title VII discriminatory demotion claim, Defendant argues that (1) the reassignment of Plaintiff's sustainability duties does not constitute an adverse employment action; (2) it was Mooney – and not Shewchuk – who made the decision to change Plaintiff's role to "Senior Sustainability Data and Insights Lead"; and (3) the change in Plaintiff's role was not, in any event, a demotion. Finally, Defendant contends that the circumstances surrounding these events do not give rise to an inference of discrimination. (Def. Br. (Dkt. No. 65) at 23, 26, 28)

### A. Prima Facie Case

As discussed above, to establish a prima facie case of discrimination under the ADEA or Title VII at summary judgment, Plaintiff must proffer evidence showing that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." Leibowitz, 584 F.3d at 498. Where a plaintiff is proceeding under a theory of discriminatory demotion, she must also offer evidence that she was "satisfactorily performing the duties required by her position" and "was demoted from her position." Goldman v. Admin. for Childs. Servs., No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *4 (S.D.N.Y. May 29, 2007) (citing Brierly v. Deer Park Union Free Sch. Dist., 359 F. Supp. 2d 275, 297 (E.D.N.Y. 2005)).

Here, there is no dispute that Plaintiff is a member of the protected class, and that she was qualified for, and satisfactorily performing the duties required by, her position prior to the reassignment of her sustainability duties to Mooney. Accordingly, the remaining issues are (1) whether Plaintiff suffered an adverse employment action in the form of a demotion (2) under circumstances giving rise to an inference of discrimination.

#### 1. Adverse Employment Action

Plaintiff alleges that she suffered an adverse employment action on November 24, 2020, when Shewchuk sent an email to the Corporate Communications team stating that, "[g]oing forward Tom [Mooney] will take sustainability under his portfolio and with support from Annette." (DiBenedetto Decl., Ex. X (Dkt. No. 77-33) at 2; Pltf. Opp. (Dkt. No. 75) at 12) According to Plaintiff, she was effectively demoted because she was "stripped of her 'Manager' title and was given far less significant duties working on data issues." (Pltf. Opp. (Dkt. No. 75) at 12)

In moving for summary judgment, Defendant contends that Plaintiff cannot establish an adverse employment action because – although her title and duties changed – "there was no change to her compensation, benefits, hours, working conditions, bonus-eligibility, material responsibilities, or seniority." (Def. Br. (Dkt. No. 65) at 24)

The Second Circuit "define[s] an adverse employment action as a 'materially adverse change' in the terms and conditions of employment." Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (quoting Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999)). "To be materially adverse, a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Id. (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)). Materially adverse changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. "Changes in assignments or responsibilities that do not 'radical[ly] change' the nature of work are not typically adverse employment actions," however. Potash v. Florida Union Free Sch. Dist., 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) (quoting Galabya v. N.Y.C. Bd. of Ed., 202 F.3d 636, 640 (2d Cir. 2000), abrogated on other grounds by Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010)). "Moreover, a plaintiff must set forth objective proof that the alleged action was materially adverse." Id. (citing Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008)) (emphasis in original).

Here, Plaintiff has not offered evidence that creates a material issue of fact as to whether she suffered an adverse employment action. Stated another way, Plaintiff has not

offered evidence that she experienced a "'materially adverse change' in the terms and conditions of [her] employment." Sanders, 361 F.3d at 755.

As an initial matter, there is no evidence that – as a result of the job change – Plaintiff saw a change in her wages and compensation, her employee benefits, her hours, her working conditions, her bonus-eligibility, her seniority, or her opportunities for promotion. (See DiBenedetto Decl., Ex. 1 (Dkt. No. 77-1) at 193:3-10; 230:13-15; Garrigan Decl., Ex. E (Dkt. No. 69-5) at 2); see also Watson v. Paulson, 578 F. Supp. 2d 554, 563-64 (S.D.N.Y. 2008) ("A lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way. . . . Nonetheless, '[i]f an employee earns the same salary, has the same benefits, works the same hours . . . and has the same opportunities for promotion following a transfer then there is no adverse employment action. . . .'") (internal citations and quotation marks omitted); Gelin v. Geithner, No. 06–CV–10176 (KMK), 2009 WL 804144, at *13 (S.D.N.Y. Mar. 26, 2009) ("Plaintiff has presented nothing to suggest that his benefits, hours, or opportunities for promotion were remotely affected by the transfer. As such, Plaintiff has not shown that this nominal transfer constituted an adverse employment action.").

Plaintiff also saw no change under the formal grading system that Harman uses to categorize jobs. In response to Plaintiff's complaints, Chief Human Resources Officer Lampman submitted Plaintiff's new role for grading by the Global Rewards Team. (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶¶ 195-99) The Global Rewards Team assigned the Senior Sustainability Data and Insights Lead position a grade of twelve – the same grade assigned to the CSR Manager position previously held by Plaintiff. (Id. ¶ 199) As a result, Plaintiff saw no

change in her salary.[11] (Id. ¶ 200; see Stewart v. City of New York, No. 22-2775, 2023 WL 6970127 , at *2 (2d Cir. Oct. 23, 2023) (finding that plaintiff did not establish a prima facie case of discrimination where he "offered no evidence to substantiate his claim that [his involuntary] transfer [to a different New York City Transit Authority facility] adversely impacted his employment conditions").

In sum, the "objective proof" before the Court indicates that the job change was "truly lateral." Potash, 972 F. Supp. 2d at 584; Watson, 578 F. Supp. 2d at 563 ("A transfer that is truly lateral and involves no significant changes in an employee's conditions of employment is not an adverse employment action regardless of whether the employee views the transfer negatively.").

As to whether the new role represented a change in the nature of Plaintiff's duties and responsibilities – apart from stating that her new position was a "data-oriented role" (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 159) – Plaintiff has not offered evidence of how her new role constituted a "significant change in the nature of [her] work." Boyd v. Presbyterian Hosp. in City of New York, 160 F. Supp. 2d 522, 536 (S.D.N.Y. 2001). As discussed above, "[c]hanges in assignments or responsibilities that do not 'radical[ly] change' the nature of work are not typically adverse employment actions." Potash, 972 F. Supp. 2d at 584 (quoting Galabya, 202 F.3d at 640. Here, Plaintiff has not offered "objective proof" demonstrating that the nature of her work "radically changed" as a result of her new role. See Jean-Pierre v. Citizen Watch Co. of Am., Inc., 18-CV-0507 (VEC), 2019 WL 5887479, at *7 (S.D.N.Y. Nov. 12, 2019) ("The receipt of undesirable assignments must be accompanied by a material detriment to an

---

[11] Moreover, Plaintiff does not allege that members of the Global Rewards Team were motivated by age-based or gender-based animus, nor does she allege that the process by which they regraded her new role was biased.

employee's working conditions to constitute an adverse employment action. A plaintiff's subjective dissatisfaction with the work assigned, absent some evidence that the assignment materially worsened her working conditions, is insufficient to make out an adverse employment action.") (internal quotation marks, brackets, and citations omitted); see also Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004) ("[S]ubjective, personal disappointments do not meet the objective indicia of an adverse employment action.") (citation omitted).

Plaintiff did experience a title change: formerly a "CSR Manager," she became "Senior Sustainability Data and Insights Lead." Plaintiff argues that the change in title constitutes a demotion, because she was "stripped of her 'Manager' title." (Pltf. Opp. (Dkt. No. 75) at 12) But the evidence is that Plaintiff suffered no "demotion," because the loss of the "manager" title had no significance under Harman's job grading system. Under that system, the Senior Sustainability Data and Insights Lead position was graded as Global Grade 12. Global Grade 12 is a manager-level position and is the same grade as the CSR Manager job that Plaintiff previously held. (Pltf. Am. R. 56.1 Cntrstmt. (Dkt. No. 82) ¶ 199; see Jean-Pierre, 2019 WL 5887479, at *7 (although plaintiff alleged she was "demoted in her reporting structure," "relegated to performing 'administrative support work,'" and was "subjectively disappointed with her new responsibilities," because "her salary, benefits, and the physical location of her work did not change," plaintiff did not make out an adverse employment action).

The Court concludes that Plaintiff has not offered evidence sufficient to create a material issue of fact as to whether she suffered an adverse employment action. Accordingly, Defendant is entitled to summary judgment on Plaintiff's Second Cause of Action for discriminatory demotion in violation of Title VII and the ADEA.

## IV. STATE LAW CLAIMS

Having determined that Defendant is entitled to summary judgment on Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL and Connecticut law claims.

"[A] district court[ ] may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." Lee v. Yang, 21Civ.7934(LGS), 2023 WL 419193, at *5 (S.D.N.Y. Jan. 26, 2023) (quoting Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) (internal quotation marks omitted)). This Court therefore declines to exercise supplemental jurisdiction, as allowing state courts to hear state law claims promotes comity between the federal and state courts. See Cohen v. Postal Holdings, LLC, 873 F.3d 394, 404-05 (2d Cir. 2017) (Calabresi, J., concurring) ("[O]ur circuit takes a very strong position that state issues should be decided by state courts.").

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (Dkt. No. 64) is granted as to the Complaint's First and Second Causes of Action. The Court declines

to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. The Clerk of Court is directed to terminate the motion (Dkt. No. 64), and to close this case.

Dated: New York, New York
September 30, 2026

SO ORDERED.

Paul G. Gardephe
United States District Judge